UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 18-CR-113 |
| v. | : | |
| JAMES GILBERT PADILLA, | : | |
| Defendant. | : | |

### STATEMENT OF OFFENSE

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Statement of Offense in the above-captioned matter. This statement is not intended to be a disclosure of all the evidence available to the United States. The parties stipulate to the following facts and agree that all dates are approximate.

1. Daniel Garrett Zancan resided in Maryland, and worked as the Chief Financial Officer for R&R Mechanical Contractors, Inc., an HVAC and plumbing construction company located in Northeast, Washington, D.C.

2. Hollie Ann Nadel advertised massage services on Backpage.com and provided those services in Maryland and the District of Columbia.

3. Defendant James Padilla resided in Maryland. He maintained a bank account at Bank of America. Padilla owned and operated a trial and litigation support business, which maintained a bank account at JP Morgan Chase ("Chase Bank"). At the time of the conduct at issue in this case, Chase Bank did not have any branches in the District of Columbia.

4. In 2015, Padilla responded to Nadel's advertisement for massage services on Backpage.com and met Nadel multiple times. Their relationship developed into a personal, romantic one.

5.      In addition to being romantically involved with Nadel, Padilla started serving as Nadel's "personal assistant," which included storing items for Nadel at his residence and storage facilities, and depositing thousands of dollars in cash from Nadel's massage business in various accounts as directed by Nadel.

6.      Beginning in or about January 2017, Nadel introduced Padilla to Zancan so Padilla and Zancan could collect and provide money to Nadel, who purportedly owed large sums of money to individuals (hereinafter "purported mobsters") who threatened to injure, kidnap, and unlawfully confine Nadel unless the debt was paid.

7.      Padilla and Zancan began to provide money to Nadel to help her pay her alleged debt to the purported mobsters.

8.      As detailed below, between approximately January 17, 2017, and March 15, 2017, Zancan provided Padilla—through multiple wire transfers and a check—with a total of approximately $365,000 of funds that Zancan stole from R&R Mechanical Contractors, Inc., on behalf of Nadel. Although Padilla ensured that most of these funds were returned to Zancan for delivery in cash to the purported mobsters in New York, Padilla kept $62,890 of the stolen funds for his personal benefit.

9.      On January 17, 2017, Zancan initiated a wire transfer from R&R Mechanical Contractors' Service Division Account at SunTrust Bank in the amount of $5,600 to Padilla's Bank of America account.

10.     On January 24, 2017, Zancan initiated a wire transfer in the amount of $220,000 from the same R&R Mechanical SunTrust account to Padilla's trial and litigation support business' Chase Bank account. Following the wire transfer, Zancan and Padilla traveled to Trenton, New

Jersey. On January 25, 2017, Padilla obtained five cashier's checks from Chase Bank; the checks totaled $152,605 and were drawn from Padilla's trial and litigation support business and made payable to "Daniel Zancan." Soon thereafter, Zancan cashed the five cashier's checks at a check cashing business in Trenton, New Jersey.

11. On January 27, 2017, Zancan delivered cash in New York, New York, for the benefit of the purported mobsters, including cash he received from Padilla.

12. On February 1, 2017, Zancan initiated a wire transfer from the aforementioned R&R Mechanical Contractors SunTrust bank account in the amount of $100,000 to Padilla's trial and litigation support business' Chase Bank account. Following the transfer, Zancan and Padilla again traveled to Trenton, New Jersey. On February 2, 2017, Padilla obtained a cashier's check in the amount of $80,000 from Chase Bank. Padilla cashed the check at a check cashing business in Trenton, New Jersey, and provided proceeds in cash to Zancan for delivery to the purported mobsters.

13. On February 15, 2017, Zancan removed check number 1450 from R&R Mechanical Contractors' check register for the aforementioned SunTrust account and wrote a check in the amount of $20,000 payable to Padilla's trial and litigation support business. Zancan wrote "Retainer Fee" in the check memo and signed the check. Zancan provided the check to Padilla. On February 17, 2017, Padilla deposited the $20,000 check into his trial and litigation support business' Chase Bank account. When Padilla received check 1450, he knew or should have known that the funds were stolen, i.e., that they were derived from bank fraud.

14. On or about March 15, 2017, Zancan initiated a wire transfer from R&R Mechanical Contractors' aforementioned SunTrust account in the amount of $20,000 to Padilla's Bank of America account.

15. Towards the end of the time that Zancan was stealing money from his employer, Padilla and Zancan entered into a fraudulent retainer agreement, which was backdated January 23, 2017, whereby Padilla's trial and litigation support business agreed to provide R&R Mechanical Contractors, Inc. with "assistance regarding trial exhibit preparation, deposition video clip preparation, Powerpoint slide assistance, and presentation of all of the appropriate items." The agreement listed an estimated cost of services of $360,000.00 and provided for a non-refundable retainer of $60,000.00. No actual services were provided or intended.

16. Padilla had no right to any of the funds he received from Zancan or R&R Mechanical Contractors. Moreover, as noted above, Padilla kept—for his personal benefit—approximately $62,890 of the funds that Zancan stole from R&R Mechanical Contractors. In keeping those funds, Padilla knew or had reason to know that the property was stolen yet kept the property anyway intending to deprive R&R Mechanical Contractors of the right to the property and to the benefit of the property.

Respectfully submitted,

JEANINE FERRIS PIRRO
U.S. Attorney

By:  /s/ Kondi Kleinman
Kondi Kleinman, Cal. Bar No. 241277
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W. | Washington, D.C. 20530
(202) 252-6887 | kondi.kleinman2@usdoj.gov

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me regarding these offenses. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crimes charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 7/30/2025

JAMES GILBERT PADILLA
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 11.24.25

A.J. KRAMER, Esq.
Counsel for Defendant Padilla

5